UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JANE MONREAL,

    Plaintiff,

vs.                                                Case No.:

SCRIPPS MEDIA, INC. d/b/a WFTX-TV
and EVAN PAPPAS,

    Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff JANE MONREAL ("Monreal") brings this action against Defendants SCRIPPS MEDIA, INC. d/b/a WFTX-TV ("Scripps" or "WFTX") and EVAN PAPPAS ("Pappas") (collectively, "Defendants") and in support thereof, alleges as follows:

### Nature of the Case

1. This is an action to remedy civil rights violations including race discrimination and retaliation brought pursuant to 42 U.S.C. § 1981 ("§ 1981").[1] Plaintiff seeks equitable relief and damages including: declaratory and

---

[1] Monreal is also pursuing administrative remedies for race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Florida Civil Rights Act of 1992 and, thus, may amend her Complaint to include those claims once the administrative remedies are exhausted.

injunctive relief; reinstatement or back and front pay in lieu thereof; compensatory damages; punitive damages; attorneys' fees, costs and expenses; and all other relief this Court deems just and appropriate.

## Parties, Jurisdiction, and Venue

2. Monreal is a citizen of the United States and a resident of Lee County, Florida.

3. Upon information and belief, Pappas is a citizen of the United States and a resident of Lee County, Florida.

4. Scripps is a foreign for-profit corporation registered to do business in Florida and doing business in Lee County, Florida with its principal place of business in Cincinnati, Ohio.

5. All actions complained of herein occurred in Lee County, Florida.

6. This Court has federal question jurisdiction of this action pursuant to 42 U.S.C. § 1981, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

7. Venue is proper in this district. 28 U.S.C. § 1391(b).

## Facts

8. Monreal is Asian.

9. In 2015, Scripps hired Monreal as the morning anchor at KSHB in Kansas City, Missouri.

10. In 2017, Scripps recruited Monreal to transfer to sister station WFTX,

Scripps' Fox affiliate in Cape Coral, Florida, as the morning anchor.

11. Darryll Green was the General Manager at WFTX and Monreal's supervisor.

12. Amy Wegmann, a white female, and Patrick Nolan, a white male, were anchoring the evening news for WFTX at the time.

13. In September 2018, Amy Wegmann resigned for personal reasons and Green temporarily reassigned Monreal to fill Wegmann's evening anchor spot.

14. In November 2018, Green permanently reassigned Monreal to the evening anchor position.

15. On January 11, 2021, Scripps entered into a three-year employment contract with Monreal to work as an Anchor/Multi-Media Journalist at WFTX-TV in Cape Coral, Florida commencing December 3, 2020.

16. In February 2021, Darryll Green announced that he was leaving WFTX to take a job in Miami, Florida.

17. Darryll Green had praised Monreal's work while he was her supervisor.

18. In April 2021, Scripps replaced Darryll Green with Pappas, a white male.

19. Pappas became the Vice President and General Manager of WFTX and Monreal's supervisor.

20. Scripps transferred Pappas from another station in Colorado.

21. Pappas has a reputation for forcing out or terminating Scripps' employees, particularly minority employees.

22. Pappas immediately reduced the marketing support for the evening news team and instead devoted nearly all resources to promoting the morning news team, which set up the evening news team for failure.

23. The evening news team at the time included two minorities: Monreal and Chief Meteorologist Derek Beasley (Black). Patrick Nolan (Caucasian) was the third member of the team.

24. The morning news team at the time included all Caucasians: Amy Wegmann, who had returned to WFTX as a part-time anchor role, Lisa Greenberg, Lauren Petrelli, Chris Shaw, and Trent Aric.

25. Pappas immediately expressed his dislike for Monreal, saying he did not care for the female evening anchor.

26. Pappas expressed his preference for white anchors and meteorologists.

27. Pappas offered Wegmann more money to go back to the evening anchor position.

28. Pappas also commented that John Baron (Caucaision male in his 20s) and Patrelli (Caucasian female in her 20s) would look good anchoring together,

4

commenting on Baron's "guns" (referring to his biceps). He said a competing station had taken his game plan by using "attractive people" to tell positive stories.

29. Pappas asked minority employees if they would like to transfer to other stations and/or suggested that they would be good at other stations, often where the anchor's race matched the general community. For example:

    a. When Pappas learned that Monreal was from Broward County, Florida, he said that Scripps has a station in Plantation and asked if she wanted to transfer there.

    b. He also suggested to Patricia Ling (a Hispanic female in her 40s) that maybe she would want to return to Nashville where Scripps has a station.

    c. He also told a prior employee that he sounded too "Black" for Colorado Springs.

    d. He told another Colorado employee that "Southern Colorado wasn't ready for a female sports anchor, especially a minority."

30. Pappas did not suggest that white employees move to other stations.

31. Pappas criticized and ignored minority employees, including Monreal, while praising and engaging with white employees. For example, Pappas criticized the evening news anchors indicating that the broadcast was boring, but told Nolan, the white male anchor, that it was not his fault, it was the "elements" around him, meaning Monreal and the Black Chief Meteorologist. On

the rare occasion when Pappas would visit the newsroom, he would not speak to Monreal but would speak to the white male anchor. In contrast, he described the white male anchors as "authentic."

32. Pappas terminated Managing Editor, La'Qunta Dixon, a Black female.

33. La'Qunta Dixon accused Defendants of racism.

34. Pappas had indicated he would fire Dixon approximately a month before he did so. He also bragged that he had surreptitiously taken a photograph of Dixon emotionally upset when he fired her.

35. When asked about including a Spanish "crawl" (scrolling message at the bottom of the screen) during severe weather such as hurricanes because the viewing area has a significant Spanish population who need information in emergency situations, he refused saying "we are an English-speaking station."

36. When a tropical storm threatened the area during the July 4th weekend in 2021, the station covered the event. Pappas made the decision that the regularly scheduled anchor, Rachel Loyd (a Black female in her 20s), would not handle the coverage. When another employee suggested that Monreal handle the coverage, Pappas refused. Instead, he approved having Nolan (a white male) anchor the coverage.

37. Pappas bragged that he was going to "blow up the evening team" and said he did not care if they sued. He also commented that he wanted to get rid of

Monreal, who was always at work, but wanted to keep Nolan, who regularly called out for his scheduled shifts.

38.     Pappas also commented that Chris Shaw (a white male) did not do well in audience research but said he wouldn't hold that against Shaw because he sat next to Monreal in the morning for so long—in other words, that Pappas implied that the audience did not care for Shaw because of Monreal.

39.     Pappas also commented that Monreal didn't have the skill set for leadership, despite that the previous General Manager praised Monreal for her leadership.

40.     Employees complained to Scripps' corporate Human Resources ("HR") and hotline about Pappas' discriminatory conduct. Pappas was aware of the employees' complaints, and griped about the fact that he was being reported to HR. Pappas told a white male employee to be careful what he said in the newsroom because "the others" run to HR.

41.     In October 2021, the local HR manager, Sha Brown (a white female), scheduled a "check-in" meeting with Monreal. Monreal expressed her displeasure with the lack of support and resources provided to the evening news team.

42.     The following week, on November 3, 2021, Sha Brown scheduled a follow-up meeting with Monreal, Brown and Pappas in which Defendants notified Monreal that they were terminating her contract and employment effective March

2, 2022.

43. The same week, Defendants also notified Derek Beasley, the black Chief Meteorologist, that his employment is being terminated.

44. At least three other Black female employees resigned since Pappas took over.

45. Since Pappas took over, seven out of eight on-air positions were offered to whites.

46. On November 23, 2021, Monreal, through her undersigned counsel, notified Scripps that she believed she was terminated because of her race and was considering filing a race discrimination lawsuit.

47. Defendants initially told that Monreal that the extension of her contract to March 2, 2022 was to allow her time to find another position. Monreal did as directed and searched for and found another job.

48. On Friday afternoon, December 17, 2021, Ms. Monreal informed the News Director, Autumn Jones, that she would be submitting her written notice, referring to the four-week notice required of the extension contract, later that day. Ms. Jones thanked her for letting her know.

49. Within two hours, while Ms. Monreal was on set for the 5:00 p.m. newscast, Ms. Jones came in and told her that Patrick Nolan would go ahead and "solo the 6" so that Monreal could "wrap things up." When Ms. Monreal asked for

clarification, Ms. Jones said she could turn in her laptop along with her written notice.

50. In her written notice, Ms. Monreal had requested that she be relieved of her on-air duties beginning on Friday, December 31, 2021, so that she could utilize all of the accrued and compensatory time which she has earned and is owed.

51. Instead, Scripps terminated Monreal effective immediately and, to-date, has not paid Monreal her accrued time.

## COUNT I
### Race Discrimination in Violation of § 1981

52. Monreal restates and incorporates herein the allegations in paragraphs numbered 1 through 51 above.

53. Defendants sabotaged Monreal and her team by not providing the evening news team with appropriate marketing and support.

54. When audience research showed that viewers did not care for white male on-air personalities, Pappas disregarded that portion of the research results and instead blamed Monreal.

55. Defendants terminated Monreal's employment and contract but offered a three-month extension agreement so that her termination would be effective on March 2, 2022, stating that the extension was to permit her time to find another job.

56. Monreal searched for and found another job and, thus, provided her four-week notice as required by the extension contract. She also requested that she be permitted to use her accrued leave time during that time period. However, Defendants refused her leave request and instead terminated her effective immediately.

57. Defendants took the above actions because of Monreal's race in violation of § 1981.

58. At all material times, Defendants knew or should have known it was illegal to discriminate against individuals with regard to the terms, conditions and privileges of their employment because of their race. Nonetheless, Defendants discriminated against Monreal willfully or with reckless disregard of the law.

WHEREFORE, Monreal requests that this Honorable Court enter judgment in her favor and against Defendants:

A. Declaring Defendants' actions to be illegal discrimination based upon race, in violation of § 1981;

B. Enjoining Defendants from future violations of § 1981 and/or requiring Defendants to take appropriate remedial action to remedy their past violations;

C. Awarding Monreal compensatory damages;

D. Requiring Defendants to pay punitive damages to Monreal;

E. Awarding Monreal the reasonable attorneys' fees, costs and expenses incurred in this matter pursuant to 42 U.S.C. § 1988; and

F. Awarding such other relief as the Court deems just and appropriate.

## COUNT II
**Retaliation in Violation of § 1981**

59. Monreal restates and incorporates herein the allegations in paragraphs numbered 1 through 51 and 55 through 56 above.

60. Defendants also took the above stated actions in retaliation for Monreal's protected activity including her participation in the internal interview and her subsequent notice that she would be suing Defendants for race discrimination.

61. At all material times, Defendants knew or should have known it was illegal to retaliate against individuals with regard to the terms, conditions and privileges of their employment for engaging in protected activity. Nonetheless, Defendants retaliated against Monreal willfully or with reckless disregard of the law including Section 1981.

WHEREFORE, Monreal requests that this Honorable Court enter judgment in her favor and against Defendants:

A. Declaring Defendants' actions to be illegal retaliation in violation of § 1981;

B. Enjoining Defendants from future violations of § 1981 and/or requiring Defendants to take appropriate remedial action to remedy their past violations;

C. Awarding Monreal compensatory damages;

D. Requiring Defendants to pay punitive damages to Monreal;

E. Awarding Monreal the reasonable attorneys' fees, costs and expenses incurred in this matter pursuant to 42 U.S.C. § 1988; and

F. Awarding such other relief as the Court deems just and appropriate.

## Demand for Jury Trial

62. Monreal demands a trial by jury on all issues so triable.

Dated this 10th day of January, 2022.

Respectfully submitted,

SHANKMAN LEONE, P.A.

/s/ Kendra D. Presswood
Kendra D. Presswood
Florida Bar No. 0935001
kpresswood@shankmanleone.com
David S. Shankman
Florida Bar No. 0940186
dshankman@shankmanleone.com
707 North Franklin Street, 5th Floor
Tampa, Florida 33602
Phone: (813) 223-1099; Fax: (813) 223-1055
*Attorneys for Plaintiff*